## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HARRIS COUNTY, TEXAS,**<br>1001 Preston Street, Suite 500,<br>Houston, TX 77002,<br><br>        *Plaintiff*,<br><br>   v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>      and<br><br>**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>      and<br><br>**DEVON BROWN, in his official capacity as EPA AWARD OFFICIAL, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br>1200 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20460,<br><br>        *Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Harris County, Texas ("Harris County") brings this action against Defendants the

United States Environmental Protection Agency ("EPA"), Lee Zeldin, in his official capacity as

Administrator of EPA, and Devon Brown, in his official capacity as EPA Award Official, and

alleges as follows:

## INTRODUCTION

1.  From day one, the Trump Administration has worked to eliminate, by any means necessary, the programs Congress created through the Inflation Reduction Act.  Its latest target is Solar for All, a program mandated by Congress to bring clean, affordable energy to low-income communities across the country.

2.  Harris County, Texas—recipient of one of the largest Solar for All awards and leader of the Texas Solar for All Coalition—developed a formidable application and workplan, built an ambitious solar energy program with its Coalition partners, and began to launch critically needed projects to protect the health, safety, and well-being of Texas families.  But on August 7, 2025, President Trump's EPA announced that it was shutting down Solar for All.  That decision, based on arbitrary and pretextual grounds, violates the Administrative Procedure Act, federal statutes, and the U.S. Constitution.  Harris County brings this action to challenge the Trump Administration's lawless efforts to end this important program.

3.  In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169.  The IRA amended the Clean Air Act to authorize EPA to establish the Greenhouse Gas Reduction Fund ("GGRF"), an "historic $27 billion investment to combat the climate crisis by mobilizing financing and private capital for greenhouse gas- and air pollution-reducing projects in communities across the country."[1]  Congress directed that $26.97 billion of this funding be obligated through competitive grants by September 30, 2024.  Congress also appropriated $30 million to EPA to help cover the program's administrative costs.

---

[1] EPA, *EPA's Implementation Framework for the Greenhouse Gas Reduction Fund*,
https://www.epa.gov/system/files/documents/2024-08/epas-implementation-framework-for-the-greenhouse-gas-reduction-fund.pdf (last visited Oct. 9, 2025).

4.   Pursuant to this mandate, EPA created three grant programs: The National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and—the focus of this lawsuit—Solar for All ("SFA").  EPA funded each program from appropriations made in the IRA: $14 billion for NCIF, $6 billion for CCIA, and $7 billion for Solar for All.

5.   Solar for All was designed to expand access to affordable, clean energy in low-income communities and to improve the health, safety, and economic stability of American families nationwide.  EPA established a competitive grant process for government entities and nonprofits to "develop long-lasting solar programs that enable low-income and disadvantaged communities to deploy and benefit from distributed residential solar, lowering energy costs for families, creating good-quality jobs in communities that have been left behind, advancing environmental justice, and tackling climate change."[2]

6.   After completing a rigorous, multi-agency review of applications, EPA selected 60 awardees to receive SFA funding, including Harris County.  By mid-August 2024, EPA had obligated all $7 billion appropriated for Solar for All.

7.   After receiving its SFA award, Harris County and the other members of the Texas Coalition worked tirelessly to build their SFA workplan and advance the Coalition's mission.  The Coalition worked to develop solar energy infrastructure that would lower energy costs and utility bills for low-income Texas families; improve public health for millions of Texas residents; create well-paying jobs and provide job training programs throughout the State; support domestic manufacturing; bolster the resilience and security of the Texas electricity grid to help reduce the

---

[2] Press Release, EPA, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar* (Apr. 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential (last visited Oct. 9, 2025).

devastating harms caused by increasingly frequent extreme-weather events; and promote American energy independence as demand for power continues to drastically outpace supply.

8.  In the months after EPA obligated all GGRF grant funding, during the leadup to the 2024 presidential election, Donald Trump made clear that he had the IRA in his sights.  He vowed to "terminate the Green New Deal," which he also called the "Green New Scam," and pledged that his administration would "rescind all unspent funds under the misnamed Inflation Reduction Act."[3]

9.  On January 20, 2025, President Trump took office and immediately launched an assault on the Greenhouse Gas Reduction Fund, including Solar for All.  Within hours of his inauguration, Trump issued Executive Order 14154, *Unleashing American Energy*.  Section 7 of the Order, titled "Terminating the Green New Deal," directed agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."  In the days that followed, the White House Office of Management and Budget ("OMB") issued two memoranda repeating the Executive Order's directive to executive agencies to "immediately pause" all IRA funds and financial assistance for the "Green New Deal." OMB Memorandum M-25-11; OMB Memorandum M-25-13.

10. EPA took immediate steps to implement these directives.  Less than ten days into the new Administration, SFA grantees, including Harris County, learned that EPA had suspended their SFA accounts and frozen their grant funds.  EPA restored grantees' access to their funds a week later, only to quickly suspend SFA accounts again.  EPA Administrator Lee Zeldin appeared on national television to discuss the Greenhouse Gas Reduction Fund, parroting President Trump's

---

[3] Emily Peck, *Trump Wants To "Terminate" Green Spending. Here's What Could Stand In His Way*, Axios (Oct. 28, 2024), https://www.axios.com/2024/10/28/trump-climate-law-ira-pullback (last visited Oct. 10, 2025).

campaign promises and stating that the "entire scheme, in [his] opinion, is criminal."[4]  EPA reinstated Solar for All operations only after multiple federal district courts enjoined the Administration's overall freeze on IRA funding.

11. The Administration, however, was committed to ending Solar for All.  On August 7, 2025, EPA announced its decision to eliminate Solar for All—this time citing the One Big Beautiful Bill Act ("OBBBA"), passed by Congress the previous month, as its basis for doing so (the "Elimination Decision").

12. But the OBBBA provides no authority for EPA's Elimination Decision.  Section 60002 of that law, the sole provision addressing the Greenhouse Gas Reduction Fund, states in full: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the ***unobligated*** balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded."  Pub. L. No. 119-21, 139 Stat. 72, 154 (2025) (emphasis added).

13. Section 60002 does not touch SFA funding because all $7 billion in grant funds were obligated long before Section 60002 was enacted.  The only unobligated funds as of the OBBBA's enactment were EPA's $19 million of remaining administrative funds—equivalent to just *seven hundredths of one percent* (0.07%) of the $27 billion Congress appropriated for the Greenhouse Gas Reduction Fund.

14. Nevertheless, on August 7, Defendant Zeldin issued a video statement announcing that EPA was "taking action to end [the SFA] program for good."[5]  Asserting that the OBBBA

---

[4] *See* Sunday Morning Futures (@SundayFutures), X (Feb. 23, 2025, 12:21 PM),
https://x.com/SundayFutures/status/1893697750937505807; *see also* Sunday Morning Futures, *Partnership With DOGE 'Has Been Outstanding,' EPA Administrator Zeldin Says*, Fox News (Feb. 23, 2025),
https://www.foxnews.com/video/6369222506112.

[5] *See* Lee Zeldin (@EPALeeZeldin), X (Aug. 7, 2025, 2:07 PM),
https://x.com/epaleezeldin/status/1953518426602803684.

"eliminates billions of green slush fund dollars," Defendant Zeldin claimed that the new law had repealed Solar for All—a program he described as a "grift" and a "boondoggle."

15. That same day, EPA sent every SFA grant recipient—including Harris County—a notice (Ex. D) informing the grantees that EPA had "made the decision to terminate the SFA program." According to EPA, Section 60002 rescinded not only the unobligated "administrative cost appropriation," but also "the grant appropriations" that had been obligated to Harris County and other grantees a year earlier. *Id.* Indeed, EPA insisted, the OBBBA had "effectively and completely terminated the statutory authority and *all* appropriations related to Solar for All." *Id.* (emphasis added). The agency then asserted, without further explanation or support, that Section 60002 made clear Congress's intent that "the SFA program is no longer to operate." *Id.*

16. EPA is wrong. Section 60002 rescinds only *unobligated* funds, meaning the $19 million EPA has remaining for GGRF administrative costs. The statute does not repeal or rescind *any* grant appropriations (Solar for All or otherwise), because all GGRF grant funds were obligated by September 30, 2024, in conformance with the IRA's deadline. Moreover, Section 60002 applies only *prospectively*, so it does not purport to retroactively repeal EPA's authority to establish and launch Solar for All, nor to undo that process, which was completed more than a year ago.

17. Consistent with the OBBBA's text, the non-partisan Congressional Budget Office estimated that Section 60002 would save the government only $19 million, i.e., EPA's remaining unobligated funding for GGRF administrative costs. Statements from Republican and Democratic lawmakers alike similarly confirm that everyone understood Section 60002 to mean exactly what it says: that it rescinds only unobligated balances, leaving untouched the obligated grant funds, including those of Solar for All.

18. EPA's stated justification for its Elimination Decision is also pretextual. Consistent with the Trump Administration's repeated directives to federal agencies to end the IRA's so-called "Green New Deal," EPA has time and again disparaged Solar for All and the other GGRF programs, making plain its determination to shut them down by whatever means necessary—legal or not. This politically motivated objective, clear from the get-go, is reinforced by EPA's transparently erroneous rationale for shuttering Solar for All.

19. EPA's Elimination Decision is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The Elimination Decision contravenes Section 134 of the Clean Air Act, which remained in effect from August 2022 until July 2025, and Section 60002 of the OBBBA. And, in unilaterally canceling a program established and funded through duly enacted congressional appropriations, with no constitutional or statutory authority, EPA's Elimination Decision violates the Constitution's Appropriations Clause and separation of powers.

20. Defendants' actions have caused and continue to cause irreparable harm to Harris County and its constituents. Harris County personnel and Texas Coalition staff have dedicated countless hours to setting up operations for Solar for All and working to deliver the program's benefits to their constituents. EPA's unlawful Elimination Decision stops this work in its tracks. It jeopardizes the County's ability to deliver critical infrastructure promised to create thousands of well-paying jobs, protect residents from extreme weather by reinforcing the County's electrical grid, and reduce energy costs for tens of thousands of low-income households. The Elimination Decision has also upended Harris County's budgetary and strategic planning, leaving the County unable to honor its commitments to the Coalition and residents of Harris County without diverting funds from other critical public programs. By halting the County's efforts to protect and improve

the lives of vulnerable residents, precipitating the loss of key personnel, and undermining the County's reputation as a reliable community and business partner, the Elimination Decision will continue to have an immediate, direct, and devastating impact on Harris County and its residents.

21. Harris County therefore asks this Court to declare unlawful and vacate Defendants' Elimination Decision, and to enjoin Defendants from carrying out the unlawful Elimination Decision.

## PARTIES

22. Defendant EPA is the agency of the federal government of the United States charged with administering the Greenhouse Gas Reduction Fund and Solar for All.  EPA is an agency within the meaning of the Administrative Procedure Act.

23. Defendant Lee Zeldin is the Administrator of EPA and the agency's highest-ranking official.  Harris County sues Mr. Zeldin in his official capacity.

24. Defendant Devon Brown is an EPA Award Official.  Mr. Brown sent the August 7, 2025 letter purporting to terminate Harris County's SFA Award Agreement.  Harris County sues Mr. Brown in his official capacity.

25. Plaintiff Harris County is a political subdivision of the State of Texas.  It is the most populous county in Texas and third most populous in the United States.  EPA awarded Harris County over $249 million under the SFA grant competition to lead a statewide initiative, the Texas Coalition, to expand access to affordable, clean energy in lower-income Texas communities.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over Harris County's claims against Defendants under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

27. Venue is proper in this District because Defendants are located in this District and a

substantial part of the acts or omissions giving rise to the claims occurred in this District. 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**I.    Solar for All and Harris County's Award.**

28. In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA"). Pub. L. No. 117-169, 136 Stat. 1818, 2065-67 (2022). Among other things, the IRA amended the Clean Air Act ("CAA") to include a new Section 134 (42 U.S.C. § 7434) directing EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF") to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 136 Stat. at 2067 (CAA § 134(c)(1)(A)). Congress appropriated $27 billion total for the Greenhouse Gas Reduction Fund—$26.97 billion for competitive grants, plus $30 million for "administrative costs." *Id.* at 2066 (CAA § 134(a)).

29. Specifically, subsection (a) of Section 134, titled "Appropriations," appropriated $7 billion to make grants to "enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies"; $11.97 billion for grants to "provid[e] [general] financial assistance and technical assistance" consistent with the Greenhouse Gas Reduction Fund's mission; and $8 billion to make grants to "provid[e] financial assistance and technical assistance in low-income and disadvantaged communities" to implement the Greenhouse Gas Reduction Fund's objectives. 136 Stat. at 2066 (CAA § 134(a)(1)-(3)). Each subsection directed EPA to establish a competitive grant-making process for the appropriated sums and stated that the sums would "remain available until September 30, 2024." *Id.*

30. Subsection (a)(4) of Section 134 addressed "administrative costs," appropriating $30 million for "the administrative costs necessary to carry out activities under [Section 134]." 136 Stat. at 2066 (CAA § 134(a)(4)). Unlike the appropriations for grant funds in subsections (1)-(3),

the funds appropriated for administrative costs were to remain available through September 30, 2031. *Id.*

31. Following the enactment of the IRA, EPA began a months-long process to "shape implementation of the GGRF."[6]  EPA conducted listening sessions, published a Request for Information seeking public comment, and submitted questions to the Environmental Financial Advisory Board to inform the design of GGRF programs.

32. In April 2023, EPA announced three competitive grant competitions under the Greenhouse Gase Reduction Fund, one of which was Solar for All ("SFA").  Solar for All was designed to "expand the number of low-income and disadvantaged communities that are primed for residential and community solar investment—enabling millions of families to access affordable, resilient, and clean solar energy."  EPA funded Solar for All with the $7 billion appropriated in CAA Section 134(a)(1).

33. The other GGRF programs announced the same day, the National Clean Investment Fund ("NCIF") and the Clean Communities Investment Accelerator ("CCIA"), were funded with the remaining $19.97 billion from Sections 134(a)(2) and (3).[7]

34. On July 28, 2023, EPA released Notice of Funding Opportunity No. EPA-R-HQ-SFA-23-01 announcing a public competition for the SFA grant funds.  *See* Ex. A.  Both individual and coalition applicants were eligible to receive an award.  *Id.* at 15.  Coalition applicants were those "composed of one lead applicant, which partners with one or more non-lead coalition member(s)

---

[6] Richard K. Lattanzio, *EPA's Greenhouse Gas Reduction Fund (GGRF)*, CRS (May 21, 2024), https://www.congress.gov/crs-product/IF12387 (last visited Oct. 9, 2025).

[7] EPA, *Frequent Questions About the Fund*, available at https://web.archive.org/web/20250423001633/https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund) (archived Apr. 23, 2025).

that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected." *Id.* at 8.

35. Harris County submitted its SFA application on behalf of a Texas-based coalition ("Texas Coalition") on or about October 12, 2023.

36. The Texas Coalition includes Harris County and eight local government and nonprofit subgrantees from across Texas: the Cities of Austin, San Antonio, and Waco; Dallas County; Clean Energy Fund of Texas, Inc.; Houston Advanced Research Center; Opportunity Home San Antonio; and Texas Energy Poverty Research Institute. The Coalition's workplan would increase access to affordable, clean energy in disadvantaged Texas communities; lower energy costs and utility bills for Texas families; create well-paying clean-energy jobs and provide training opportunities for the local workforce; enhance grid reliability and security by adding power supply to meet exploding power demand; alleviate the devastating harms caused by power-system failures during extreme-weather events; promote American energy independence by supporting domestic manufacturing and lessening dependence on foreign fuels; and reduce pollution from energy use. Through these efforts, the Coalition's work would better the lives of millions of Texas residents.

37. Following an extended review and selection process involving multiple federal agencies, EPA announced in April 2024 that it had selected 60 applicants to receive SFA awards.[8] Based on its selections, EPA estimated that Solar for All would deliver solar infrastructure projects benefiting over 900,000 households in low-income communities nationwide, create 200,000 clean-energy jobs, and save an estimated $350 million annually on energy bills during and after the five-

---

[8] Press Release, EPA, *supra* note 2.

year program.  *Id.*[9]  EPA allocated the full $7 billion appropriated for Solar for All among the 60 grantees.  *Id.*

38. EPA awarded the Harris County-led Texas Coalition $249.7 million, one of the largest SFA awards.

39. In July 2024, Harris County and EPA entered into a grant agreement, Ex. B, which was subsequently amended in December 2024 (as amended, the "Award Agreement"), Ex. C.  The Award Agreement memorializes the Texas Coalition's $249.7 million award and sets forth the terms and conditions of the grant.

40. Harris County developed, and EPA approved, a workplan consistent with the goals of Solar for All.  As described in Harris County's workplan, the Texas Coalition designed a five-year plan aimed at transforming access to distributed solar in low-income communities in Texas.  The Coalition developed an innovative "community solar" program that allows participants  to realize a 20 percent savings against their usual electricity bill by subscribing to large solar projects. Through this community solar model and other components of its ambitious workplan, the Texas Coalition seeks to create new community wealth and savings, and develop and support well-paying jobs, including supporting workforce training to serve low-income and disadvantaged residents. Bolstering solar, energy storage, and grid infrastructure would also increase Harris County's resilience to power system failures, thereby protecting medically vulnerable and other residents

---

[9] *See also* National Renewable Energy Lab, *Technical Assistance for Solar for All Grant Recipients* (Mar. 19, 2025), https://perma.cc/38JH-W8V6 (archived June 30, 2025).

during extreme weather events.[10]  Such efforts are critically important in Harris County, the most hurricane-vulnerable region in the country.[11]

41. Consistent with its workplan, Harris County allocated the award among the Texas Coalition as follows:

a.  Harris County retained $58,897,968 to provide financial assistance for community solar to low-income households throughout the County, as well as technical assistance and community-engagement support.

b.  The City of Austin received $31,593,683 to administer a community solar program, provide related financial assistance and community engagement, and support workforce development programs for Austin residents.

c.  The City of San Antonio received $21,707,659 to administer a community solar program, providing financial assistance, community engagement, and workforce-development support for San Antonio residents.

d.  Houston Advanced Research Center ("HARC") received $86,263,600 to provide financial support, community engagement, workforce development, and technical assistance for multi-family and community solar to communities across Texas.

e.  The City of Waco received $692,099 to administer a single-family rooftop solar program in partnership with HARC.

---

[10] *See* Abby Church, *Fifth Ward Community Center to Receive Federal Dollars to Become a Safe Haven During Extreme Weather*, Houston Chronicle (May 19, 2025), https://www.houstonchronicle.com/politics/houston/article/carl-walker-shelter-funds-20331575.php (explaining that SFA funds were to be used to reinforce three community centers, "allowing a vital escape for potentially hundreds of residents when storms come through") (last visited Oct. 9, 2025).

[11] *See* U.S. Federal Emergency Management Agency, *National Risk Index*, https://hazards.fema.gov/nri/map (select "Hurricane" under "Risk Index") (last visited Oct. 10, 2025); *see also* Faith Bugenhagen, *Harris County scores worst in the U.S. for hurricane risk*, Chron (Aug. 26, 2025), https://www.chron.com/politics/article/harris-county-top-hurricane-risk-21016396.php (Harris County received the highest hurricane risk score in the country, 100 out of 100) (last visited Oct. 10, 2025).

f.  Dallas County received $1,384,553 to administer a community solar program for Dallas County families in partnership with HARC.

g.  Clean Energy Fund of Texas, Inc. received $3,434,775 to administer a single-family solar program, providing financial assistance and lender engagement for these installations in small and medium-size communities in Texas.

h.  Opportunity Home San Antonio, an affordable housing provider, received $24,043,424 to administer a multifamily solar program, providing financial assistance, community engagement, and workforce-development support.

i.  Texas Energy Poverty Research Institute received $21,682,239 to support community and single-family solar programs in border communities (including Brownsville, City of El Paso, and City of Laredo).

42. After entering into the award agreement with EPA, Harris County received its full SFA award in its Automated Standard Application for Payments ("ASAP") account.  ASAP is an electronic payment system operated by the Treasury's Bureau of the Fiscal Service.  It regularly holds funds awarded to federal grantees to permit grantees to safely and easily access their award funds.  Harris County began accessing SFA grant funds through ASAP on behalf of itself and other Texas Coalition members in December 2024.

43. In the months that followed, Coalition members dedicated enormous resources to launching their SFA workplan.  Harris County, for example, devoted thousands of personnel hours to developing the plans and infrastructure for this work, including drafting, negotiating, and executing inter-local agreements with coalition members, designing systems to audit program spending, issuing purchase orders, and creating financial and performance reporting workflows.

In undertaking this ambitious, five-year plan, Harris County reasonably relied on Congress's authorization of Solar for All and EPA's commitment to achieving the program's aims.

## II.  The New Administration's Campaign to End the Greenhouse Gas Reduction Fund.

44. On January 20, 2025, President Trump took office.  On day one, his Administration launched a determined assault on the Greenhouse Gas Reduction Fund, including Solar for All.

45. Indeed, even before taking office, President Trump ridiculed the GGRF programs, dubbing them the "Green New Scam" and promising to "terminate the Green New Deal."  He further vowed that his administration would "rescind all unspent funds under the misnamed Inflation Reduction Act."[12]

### A.  The Administration's Directives to Freeze IRA Funds.

46. Within hours of his inauguration, President Trump issued Executive Order 14154, *Unleashing American Energy* ("the Energy EO").  Section 7 of the Order, titled "Terminating the Green New Deal," instructed that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."

47. The following day, January 21, 2025, the Office of Management and Budget ("OMB") issued memorandum M-25-11.  That memorandum repeated the Energy EO's "directive" to executive agencies to "immediately pause disbursements of [IRA] funds," including "funds supporting programs, projects or activities … supporting the 'Green New Deal.'"

48. OMB then issued memorandum M-25-13, directing federal agencies to pause "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to … the green new deal."

---

[12] Peck, *supra* note 3.

49. Two lawsuits were quickly filed seeking to enjoin the Administration's funding freeze. After a federal district court stayed OMB memorandum M-25-13, Order of Administrative Stay, *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Jan. 28, 2025) (ECF No. 13), OMB rescinded the memorandum. But the White House pledged to maintain the funding freeze, with White House Press Secretary Karoline Leavitt announcing that the OMB memorandum's recission was "NOT a rescission of the federal funding freeze."[13] Multiple federal district courts subsequently enjoined the Administration from implementing the funding freeze ordered by the Energy EO, OMB memorandum M-25-11, OMB memorandum M-25-13, "or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025); *see also Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 108 (D.D.C. 2025) (enjoining OMB memorandum M-25-13); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 479 (D.R.I. 2025) (enjoining multiple agencies, including EPA, from freezing grant funds already awarded under the IRA or Infrastructure Investment and Jobs Act on a non-individualized basis).

**B.    The Initial Freeze of SFA Funding.**

50. The new Administration's efforts to stop the disbursement of funds appropriated through the IRA included a freeze of already-awarded SFA grant funds.

51. On January 29, 2025, SFA grantees—including Harris County—could no longer access the grant funds in their ASAP accounts.[14] The ASAP system showed Harris County's SFA account status as "Suspended." EPA offered no explanation for this change.

---

[13] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM), https://x.com/PressSec/status/1884672871944901034.

[14] *See* Jean Chemnick, *EPA Cuts Off IRA Solar Money Already Under Contract*, E&E News by POLITICO (Jan. 30, 2025), https://www.eenews.net/articles/epa-cuts-off-ira-solar-money-already-under-contract/ (last visited Oct. 9, 2025).

52. Harris County quickly contacted the EPA project officer for Solar for All to request information related to the account suspension. The County stressed in its communication the importance of reestablishing access to the funds, explaining that "[t]he delay in obtaining these funds interferes with our project's progress, the ability to pay employees' salaries and subcontractors, our hiring, and other critical aspects of our operations." The project officer responded: "The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order."

53. EPA restored Harris County's access to its SFA funds on February 7, 2025, only to suspend access again four days later. An EPA spokesperson took a different tack when justifying the suspension this time, claiming that "separate from any Presidential [executive order] or OMB guidance, EPA personnel have identified certain grants programs as having potential inconsistencies with necessary financial and oversight procedural requirements or grant conditions of awards or programs."[15] EPA never—at that time nor since—identified any financial irregularities or oversight concerns in Solar for All.

54. This on-again, off-again experience was not unique to Harris County. All SFA grantees experienced similar freezes of their SFA funds in January and February 2025.

55. On February 21, 2025, Harris County received an email from SFA@epa.gov stating that "Solar for All grantees may resume drawing down resources in ASAP." Beginning that day— and until EPA unlawfully shut down Solar for All in early August 2025—Harris County's SFA funding remained available through the ASAP system.

---

[15] See Miriam Wasser & Barbara Moran, *What to know about the federal freeze on environmental grants in Mass.*, wbur (Feb. 14, 2025), https://www.wbur.org/news/2025/02/14/epa-trump-zeldin-massachusetts-climate-grants (last visited Oct. 10, 2025).

## C.    EPA's Determined Efforts to Terminate All GGRF Programs.

56. Despite the court orders enjoining the Energy EO and OMB Memoranda, EPA steadfastly continued its campaign to end all GGRF programs.

57. In February 2025, Defendant Zeldin began to publicly disparage the programs and grantees.  During an appearance on Fox News, he derided the Greenhouse Gas Reduction Fund, declaring that the "entire scheme, in [his] opinion, is criminal."[16]

58. On March 2, 2025, EPA officials sent a letter to the EPA Office of Inspector General ("OIG") referring the entire "GGRF program" for a "full investigation."[17] Two weeks later, the agency's OIG announced an audit of Solar for All.[18]

59. Meanwhile, President Trump's Department of Justice took up the cause, initiating its own sham investigation.  In February 2025, the FBI "recommended" to Citibank—the financial institution managing the NCIF and CCIA grant funds in lieu of the ASAP system—that it freeze every GGRF-related account for 30 days owing to suspicions of criminal activity.  *See Climate United Fund v. Citibank, N.A.*, Nos. 25-5122, 25-5123, __ F.4th __, 2025 U.S. App. LEXIS 22532, at *50 (D.C. Cir. Sept. 2, 2025) (Pillard, J., dissenting) (recounting undisputed facts).  Immediately thereafter, the then-Chief of the Criminal Division of the Washington, D.C. U.S. Attorney's Office refused to send a letter *ordering* Citibank to freeze the accounts, citing insufficient evidence to support such an order, and was forced to resign.  *Id.* at 51.  Following her resignation, the then-

---

[16] *See* Sunday Morning Futures, *supra* note 4.

[17] Letter from W.C. McIntosh, Acting Deputy Administrator, EPA, to Nicole Murley, Acting Inspector General, EPA (Mar. 2, 2025), available at https://www.epa.gov/system/files/documents/2025-03/epaigrequest030225.pdf (last visited Oct. 9, 2025).

[18] Memorandum, U.S. EPA Office of Inspector General (Mar. 19, 2025), available at https://web.archive.org/web/20250906080631/https://www.epaoig.gov/sites/default/files/document/2025-03/oig_notification_memo_oa-fy25-0043.pdf (archived Sept. 6, 2025).

interim U.S. Attorney for the District of Columbia personally submitted a seizure warrant application to a magistrate judge, which was denied for lack of probable cause.  *Id.*

60. Undeterred, EPA officials themselves directed Citibank to suspend all GGRF accounts "until further notice."  *Id.* at *55.  When the NCIF grantees sued, EPA responded by shutting down the programs altogether, sending every NCIF and CCIA grantee an identical letter purporting to terminate their grants, "effective immediately."  *Id.* at *58.

61. The district court entered a temporary restraining order, and subsequently issued a preliminary injunction, that barred EPA from dismantling the grant programs or clawing back the grant funds.  *Id.* at *59-61.  The court held that EPA's actions, seeking to "effectively unilaterally dismantle a program that Congress established," violated the constitution's separation of powers.  *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 116 (D.D.C. 2025).

62. On appeal, a divided panel of the D.C. Circuit vacated the injunction.  *Climate United Fund*, 2025 U.S. App. LEXIS 22532, at *10-12.  Judge Pillard dissented, detailing EPA's months-long campaign to dismantle the entirety of the Greenhouse Gas Reduction Fund "[b]ased on nothing more than the President's announced vendetta against the 'Green New Deal.'"  *Id.* at *65.  Petitions for rehearing en banc are pending as of the date of this complaint.  *See Climate United Fund v. Citibank, N.A.*, Nos. 25-5122, 25-5123, Doc. 2134363 (Sept. 10, 2025) & Doc. 2134366 (Sept. 10, 2025).

### III.    EPA's Unlawful Dismantling of Solar for All.

63. With the NCIF and CCIA programs embroiled in litigation, EPA turned its attention to eliminating the final GGRF program: Solar for All.  The agency found its answer in Pub. L. No. 119–21, commonly known as the One Big Beautiful Bill Act ("OBBBA").  President Trump signed the OBBBA into law on July 4, 2025.

64. Section 60002 of the OBBBA addresses the GGRF program.  It provides, in its entirety, as follows:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Pub. L. No. 119-21, 139 Stat. 72, 154 (2025).

65. Consistent with the statutory deadline set out in Section 134, all GGRF grant funds contemplated in Section 134(a)(1)-(3) had been obligated by September 30, 2024.  The only remaining "unobligated balances" as of July 2025 were $19 million made available to EPA for administrative costs under Section 134(a)(4).

66. Consistent with Section 60002's limited rescission of "unobligated balances … made available to carry out" Section 134, the non-partisan Congressional Budget Office ("CBO") estimated that Section 60002 would save the government only $19 million, *i.e.*, the remainder of the funds appropriated for EPA's administrative costs associated with implementing GGRF programs—a tiny fraction of the total $27 *billion* appropriated for the Greenhouse Gas Reduction Fund.[19]

67. Not surprisingly, Members of Congress—Republicans and Democrats alike—shared this understanding.  In May 2025, Representative Morgan Griffith (R-PA), then-chair of the Environmental Subcommittee, stated the following with respect to the legislation that would become Section 60002: "if a grant was already given, as far as this bill is concerned, then that would still be going forward."[20]  Representative Brett Guthrie (R-KY), Chair of the House Energy

---

[19] *See* Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline*, Table 6, Rows 20–22 (June 29, 2025), https://www.cbo.gov/publication/61534 (last visited Oct. 9, 2025).

[20] House Committee on Energy and Commerce, *Full Committee Markup of Budget Reconciliation Text Part 1*, at 5:40:23-5:42:03 (YouTube, May 13, 2025), https://www.youtube.com/live/J4fGR1CiNGg?si=0kz8e0kADDcUT35Q&t=20423 (last visited Oct. 9, 2025).

and Commerce Committee likewise stated that the OBBBA "does not close the grants on any obligated funds." *Id.* And Senator Shelley Capito (R-WV), Chair of the Senate Environment and Public Works Committee, explained in the leadup to Section 60002's drafting that Congress would not "'claw back' grants the EPA has distributed to recipients through the [IRA], including $27 billion under the Greenhouse Gas Reduction Fund."[21] "Money that's already been obligated and out the door," she stated, "that's a decision that's final." *Id.*

68. EPA, however, had other ideas. One month after OBBBA was enacted, on August 7, 2025, Defendant Zeldin issued another online video statement about the Greenhouse Gas Reduction Fund—this time concerning Solar for All. Mr. Zeldin claimed that OBBBA had "eliminate[d] billions of green slush fund dollars by repealing the Greenhouse Gas Reduction Fund, including a $7 billion program called Solar for All."[22] Calling Solar for All a "grift" and a "boondoggle," Mr. Zeldin asserted that EPA was "taking action to end this program for good." *Id.*

69. That same day, Devon Brown, on behalf of EPA, sent every SFA grantee—including Harris County—a purported "Termination" notice stating that EPA had decided to terminate Solar for All altogether. *See* Ex. D.

70. In the Notice, EPA explained that it had "made the decision to terminate the SFA program" pursuant to the OBBBA. Ex. D at 1. According to EPA, "Section 60002 of OBBBA repeal[ed] the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434." *Id.* EPA represented that Section 60002 effected a "repeal of the grant appropriations in CAA 134(a)(1)-(3)" as well as a "rescission of the administrative appropriation in section 134(a)(4)." *Id.*

---

[21] *Q&A: Sen. Shelley Moore Capito, Incoming EPW Chair* (Nov. 20, 2024) https://www.capito.senate.gov/news/in-the-news/qanda-sen-shelley-capito-incoming-epw-chair (last visited Oct. 9, 2025).

[22] *See* Lee Zeldin (@EPALeeZeldin), *supra* note 5.

71. EPA further stated:

As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible.

*Id.*

72. Finally, the agency insisted: "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate." *Id.*

73. EPA did not explain how Section 60002 could have "repealed" or "rescinded" the "grant appropriations in CAA 134(a)(1)-(3)," *id.*—all of which were obligated by Section 134's September 30, 2024 deadline—when Section 60002 explicitly rescinds only "unobligated balances."

74. Moreover, "courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012). Congress did nothing of the sort in Section 60002. Yet EPA did not articulate how, despite the law's plainly prospective application, Section 60002 deprived the agency of "substantive legal authority" to administer already awarded grant funds.

75. Nor did EPA explain how Section 60002 evinced Congress's intent that the "SFA program is no longer to operate," Ex. D, when Section 60002 rescinds just 0.07%—that is, *seven hundredths of one percent*—of the monies Congress appropriated to implement Section 134.

76. Finally, EPA did not explain how its decision to eliminate Solar for All can be squared with Section 134 itself, which remained in effect from August 16, 2022 until July 4, 2025, and

22

pursuant to which EPA was required to establish the grant program and obligate the grant funds by September 30, 2024.

77. EPA's reading of Section 60002—its sole justification for shutting down the entirety of Solar for All and retracting all $7 billion of grant funds already obligated—is erroneous and pretextual.

78. In a letter sent to EPA following the agency's announcement of the Elimination Decision, 30 additional Senators protested EPA's "false claims that the OBBBA rescinded previously-obligated GGRF funding."[23]  "Lawmakers relied on CBO's 'score,' or the estimated cost or savings of each provision [of the OBBBA]," the Senators wrote, "to ensure the reconciliation bill met each Committee's savings or spending instructions as set by the Budget Committees." *Id.*  And CBO's $19 million estimate "d[id] not include a penny of the three grant programs." *Id.*

79. The day after EPA announced its Elimination Decision, Harris County was blocked from accessing the grant funds in its ASAP account, with the account status again showing as "Suspended," and nearly all of its grant funds wiped out.

80. On August 18, 2025, consistent with EPA's pledge to eliminate Solar for All, Harris County's SFA account status on the ASAP system changed from "Suspended" to "Liquidated."

## IV.    Harris County's Administrative Appeal.

81. EPA's Notice of Termination set forth a dispute process pursuant to 2 C.F.R. § 1500.15 with a deadline of 30 days to submit a dispute to the agency's Disputes Decision Official ("DDO").

---

[23] Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. On Envtl. & Pub. Works, et al. to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), available at https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf (last visited Oct. 9, 2025).

82. Harris County timely submitted a dispute to the agency's DDO, challenging EPA's termination of its SFA award and decision to dismantle Solar for All.  *See* Ex. E.

83. The dispute-resolution process set out at 2 C.F.R. § 1500.15 does not establish a jurisdictional exhaustion requirement.  *See Darby v. Cisneros*, 509 U.S. 137, 153 (1993).

84. Even if it did so, exhaustion is not required where, as here, agency review is plainly futile. *See Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 157 (D.C. Cir. 2006).  EPA's DDO lacks authority to overturn or disregard the Elimination Decision.  The agency's justification for its Elimination Decision is that, pursuant to OBBBA, it lacks "substantive legal authority" to administer Solar for All.  Moreover, the agency's top official—Defendant Zeldin—has publicly endorsed the program's dismantling, calling Solar for All "a grift" and a "boondoggle," and insisting that "EPA no longer has the authority to administer the program."

85. Accordingly, without an order from this Court setting aside the Elimination Decision, Harris County's administrative dispute is futile.

**V.      Defendants' Actions Have Caused and Will Continue to Cause Irreparable Harm.**

86. EPA's unlawful actions have caused irreparable harm to Harris County, jeopardizing the County's work to improve residents' financial stability, health, and safety; harming the County's reputation; creating operational havoc; and undermining the mission of the Texas Coalition to improve community health, safety, and resilience through increased access to and deployment of clean energy.

87. Owing to Defendant's actions, ongoing projects—in which significant personnel time has already been invested—are at risk of collapse and future projects are stalled.  Without Solar for All, Harris County cannot deliver critical infrastructure to reduce energy costs for thousands of low-income families, add power supply in the State to meet exploding demand, or increase electrical-grid resilience to maintain power during extreme weather events for, among others,

medically vulnerable individuals. Harris County thus faces an impossible choice: compromise public safety and backtrack on its promise to lower energy costs for low-income households, or divert funds away from other critical public programs. In either scenario, Harris County residents will suffer irreparable injury to their safety, health, and well-being.

88. Harris County will also experience substantial reputational harm—both vis-à-vis its constituents and community partners (because the County may not be able to deliver on its promises) and with respect to investors and development partners (because the County may not be able to meet its SFA-related financial commitments). Defendants' purported termination of the program will likely force the County (and Coalition members) to breach existing agreements, hindering its ability to secure contracts and partnerships with key stakeholders, particularly on favorable terms.

89. By purporting to eliminate Solar for All, Defendants have also impaired Harris County's ability to recruit and maintain highly skilled employees and contractors who perform essential services. The salaries of at least one Harris County employee and many subgrantee employees are funded exclusively through the County's SFA award. Numerous subgrantee staff have already lost their jobs as a direct result of Defendants' actions, and more employees will likely be laid off in the weeks to come. These losses harm the Texas Coalition and further hinder its ability to lower energy costs and protect the health and safety of millions of Texans.

90. The harms borne by Harris County are illustrative of the devastating harm the Elimination Decision will cause nationwide. Solar for All was an integral part of this country's most ambitious effort to slow the climate crisis, promising millions of Americans access to affordable, clean solar energy; improved public health; American energy production and independence; resilience to grid failures in extreme weather; and hundreds of thousands of clean

energy jobs.  By seeking to dismantle Solar for All in its entirety, Defendants have scuttled awardees' efforts to serve their constituents and stripped millions of Americans of critically needed investments in their family's health, safety, and economic security.

## CAUSES OF ACTION

## COUNT I – VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)(A)-(C)

91. Harris County repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

92. Defendants' Elimination Decision constitutes final agency action under the Administrative Procedure Act ("APA").

93. The APA authorizes this Court to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations"; or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)-(C).

94. Defendants' Elimination Decision is contrary to the U.S. Constitution because, among other things, Article I of the Constitution vests Congress with all legislative and appropriations powers.  The President's role in the legislative process is limited by Article I to the power to veto proposed legislation.  Art. I, § 7, cl. 2-3.  The Constitution does not authorize or permit the President or executive agencies to unilaterally amend or cancel statutes or appropriations that Congress has duly enacted.  Instead, the Executive is charged to "take Care that the Laws be faithfully executed."  Art. II, § 3.  EPA's Elimination Decision violates these precepts and overrides the Constitution's separation of powers by seeking to cancel a congressionally mandated program and lawfully enacted appropriations that were obligated to Harris County before the IRA's September 30, 2024 statutory deadline.

95. Defendants' Elimination Decision exceeds statutory limitations and violates existing law because, among other things:

    a. The Elimination Decision violates Section 60002 of the OBBBA, Pub. L. No. 119-21, which applies prospectively and rescinds only "*unobligated* balances" as of the day before the law's enactment. Section 60002 does not purport to touch the existing grant programs or displace already obligated funds. To the contrary, Section 60002's terms make clear that the grant program and funds are to remain in place.

    b. EPA's Elimination Decision violates Section 134 of the Clean Air Act, 42 U.S.C. § 7434, which remained in effect from August 2022 to July 2025, and mandated that EPA establish the grant program and obligate the grant funds by September 30, 2024. It provides zero authority for EPA to cancel the grant program.

    c. EPA's Elimination Decision violates federal appropriations law, which legally requires EPA to spend the funds appropriated for distribution under Section 134 of the Clean Air Act, 42 U.S.C. § 7434, because Section 60002 applies prospectively and EPA has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

96. Defendants' Elimination Decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, among other things:

    a. EPA's stated justification for the Elimination Decision is unreasonable on its face. The agency's rationale patently misrepresents Section 60002 of the OBBBA and otherwise contradicts the law's plain terms.

b.  EPA's stated justification for the Elimination Decision is pretextual—an excuse to kill Solar for All, which the Trump Administration has sought to do from its first day in office.

c.  EPA has not otherwise provided an adequate or reasoned basis for its Elimination Decision.

97. Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706(2), Harris County is entitled to: a declaration that Defendants' Elimination Decision violates the APA; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

## COUNT II – VIOLATIONS OF THE U.S. CONSTITUTION
### (Appropriations Clause, Separation of Powers)

98. Harris County repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

99. Article I of the United States Constitution vests "all legislative powers" in Congress. U.S. Const. art. I, § 1.  Article I defines the President's role in the legislative process through the Presentment Clauses, which provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2-3.  The President's role in the legislative process is thus confined to "a limited and qualified power to nullify proposed legislation by veto."  *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 947 (1983).

100.    Congress also has exclusive "power of the purse."  Article I's Spending Clause vests Congress with the exclusive power to expend Treasury funds for the "general Welfare of the

United States." U.S. Const. art. I, § 8, cl. 1. The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 7. The purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

101. The Executive Branch, including the EPA, has only those powers conferred on it by Article II of the Constitution and federal statutes. No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, and neither the President nor executive agencies may unilaterally amend or cancel appropriations Congress has duly enacted.

102. In purporting to eliminate Solar for All, Defendants seek to cancel $7 billion of the $27 billion Congress appropriated, and required to be obligated by September 30, 2024, to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 136 Stat. at 2067.

103. Neither Section 60002 of the OBBBA nor any other statute authorizes Defendants' Elimination Decision; such action instead directly contravenes Section 60002.

104. Defendants purport to cancel a program established and funded through lawfully enacted congressional appropriations, without any basis in constitutional or statutory authority. Defendants have disregarded Congress's legislative enactments and have exceeded the bounds of Executive authority conferred on that branch by the Constitution, in violation of the Constitution's structural separation of powers, including as manifested in the Appropriations Clause.

105. For these reasons, Harris County is entitled to: a declaration that Defendants' Elimination Decision violates the Constitution's Appropriation's Clause, Presentment Clauses,

and separation of powers; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

## COUNT III – ACTIONS IN EXCESS OF STATUTORY AUTHORITY OR CONTRARY TO CONSTITUTION

106.    Plaintiff repeats and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    Federal courts possess the power in equity to grant injunctive relief with respect to violations of federal law by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

108.    Defendants' Elimination Decision is *ultra vires* because no act of Congress authorizes that action, and it violates the Constitution of the United States

109.    Pursuant to 28 U.S.C. §§ 2201, 2202, Harris County is entitled to: a declaration that Defendants' Elimination Decision is *ultra vires* and invalid; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Harris County, Texas, respectfully requests that this Court grant the following relief:

  i.    Declare that Defendants' Elimination Decision violates the Administrative Procedure Act, federal statutes (Section 60002 of the OBBA and Section 134 of the Clean Air Act, 42 U.S.C. § 7434), and the U.S. Constitution;

 ii.    Vacate and set aside Defendants' unlawful Elimination Decision;

iii.    Enjoin Defendants from implementing the unlawful Elimination Decision (i.e., from shutting down Solar for All on the erroneous and pretextual grounds given

and from deobligating, expending, or otherwise placing beyond this Court's jurisdiction any funds appropriated by Congress for Solar for All);

iv.  Award Harris County reasonable fees, costs, and expenses, including attorney fees; and

v.  Grant any such other relief that the Court deems just and proper.

Dated:  October 13, 2025

Respectfully submitted,

Noah C. Shaw (*pro hac vice* forthcoming)
FOLEY HOAG LLP
1301 Ave. of the Americas
25th Floor
New York, NY 10019
Tel. (212) 812-0400
ncshaw@foleyhoag.com

*/s/ Beth C. Neitzel*
Beth C. Neitzel (103611)
Emily J. Nash (MA0031)
Kevin Y. Chen (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
enash@foleyhoag.com
kchen@foleyhoag.com

**CHRISTIAN D. MENEFEE**
HARRIS COUNTY ATTORNEY

*/s/ Neal A. Sarkar*

**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**NEAL A. SARKAR**
Special Assistant County Attorney
Texas State Bar No. 24093106
D.D.C. Bar ID: TX0088
neal.sarkar@harriscountytx.gov

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Counsel for Harris County, Texas*